IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

JAMES JERVIS and CHINYERE
ALEX OGOKE.

Case No. 21 CR 486-2
Judge Franklin U. Valderrama

MEMORANDUM OPINION AND ORDER

Defendants James Jervis (Jervis) and Chinyere Alex Ogoke (Ogoke, collectively with Jervis, Defendants) are alleged to have concocted a scheme inducing foreign nationals to invest at least approximately $1,355,930 in InvestUS Property LLC (InvestUS), a real estate investment business, by falsely and fraudulently representing to investors that their purported invested funds would be used to purchase and sell real estate in the United States, namely Chicago, for a profit.

The Government has submitted a *Santiago* proffer (Proffer) seeking the preliminary admission of statements made by Ogoke's co-conspirators pursuant to Federal Rule of Evidence 801(d)(2)(E). R.[1] 55, Santiago Proffer. Ogoke filed a Response, R. 64, in opposition and the Government filed a Reply, R. 69.

---

[1]Citations to the docket are indicated by "R." followed by the docket number or filing name, and where necessary, a page or paragraph citation.

For the following reasons, the Court conditionally admits all the categories of statements listed in the Government's *Santiago* proffer, and reserves ruling on other statements sought to be admitted.

## Legal Standard

Out-of-court statements offered for the truth of the matter asserted are typically inadmissible hearsay. Fed. R. Evid. 801(c), 802. Of relevance here, under Federal Rule of Evidence 801(d)(2)(E), a "statement" is not hearsay if it "is offered against a party" and "was made by the party's co[-]conspirator during and in furtherance of the conspiracy." *See also United States v. Cardena*, 842 F. 3d 959, 993 (7th Cir. 2016). A district court may admit co-conspirator statements conditionally based on the government's pretrial proffer, known as a "*Santiago* proffer." *United States v. Davis*, 845 F.3d 282, 286 (7th Cir. 2016) (citing *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978), *overruled in part on other grounds by Bourjaily v. United States*, 483 U.S. 171, 176–81 (1987)). Although Rule 801(d)(2)(E) refers to "co-conspirators," the Rule applies to both formal conspiracies and joint ventures. *United States v. Reynolds*, 919 F.3d 435, 439 (7th Cir. 1990) ("Although the existence of a conspiracy allows the prosecution to use co-conspirator statements that would otherwise be hearsay, it is not necessary to charge a conspiracy in order to take advantage of Fed. R. Evid. 801(d)(2)(E); it is enough to show that a criminal venture existed and that statements took place during and in furtherance of that scheme.");

*see also United States v. Rea*, 621 F. 3d 595, 604 (7th Cir. 2010) ("a prosecutor need not charge a conspiracy to take advantage of Rule 801(d)(2)(E).") (cleaned up).[2]

The purpose of a *Santiago* proffer "is to facilitate the admissibility of co-conspirator evidence by making a preliminary showing that 1) a conspiracy existed, 2) the defendant and the declarant were members of thereof, and 3) the proffered statement(s) were made during the course of and in furtherance of the conspiracy." *United States v. Dekelaita*, 875 F. 3d 855, 859–60 (7th Cir. 2017) (cleaned up). The government must establish each element by a preponderance of the evidence. *United States v. Gil*, 604 F.2d 546, 549 (7th Cir. 1979).

First, the Government must establish that there was a joint venture for an illegal purpose, or for a legal purpose using illegal means. *Id.* Second, the Government must show that it is more likely than not that Defendants "(1) knew of the conspiracy and (2) intended to associate [themselves] with the criminal scheme." *United States v. Stephenson*, 53 F.3d 836, 843 (7th Cir. 1995) (cleaned up). To determine both the existence of a joint venture and a defendant's participation in it, the Court can consider the statements sought to be admitted. *Bourjaily*, 483 U.S. at 176–81. But the contents of the proffered statements alone are not sufficient to establish these factors; there must also be corroborating evidence independent of the statements themselves. *United States v. Harris*, 585 F.3d 394, 398–99 (7th Cir. 2009). The

---

[2]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

corroborating evidence may be either direct or circumstantial. *United States v. Johnson*, 592 F.3d 749, 754–55 (7th Cir. 2010).

As to the third element, whether a statement was made "in furtherance" of the joint venture, courts evaluate the statement in the context in which it was made and look for a "reasonable basis" on which to conclude that the statement furthered the venture. *United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010). Generally, a statement that is "part of the information flow between conspirators intended to help each perform his role" satisfies the "in furtherance" requirement. *United States v. Alviar*, 573 F.3d 526, 545 (7th Cir. 2009).

"*Santiago* proffers are, by nature and necessity, argumentative and summary." *United States v. Cox*, 923 F.2d 519, 527 (7th Cir. 1991). In all, there is a "relatively low burden of proof" on the admissibility of co-venturer statements. *United States v. Shoffner*, 826 F.2d 619, 628 (7th Cir. 1987). If the Court determines the statements are admissible, the jury may consider them for any purpose. *United States v. Thompson*, 944 F.2d 1331, 1345 (7th Cir. 1991). Any statement made by a co-schemer during and in furtherance of the illegal scheme is admissible against all co-schemers. *United States v. Lindemann*, 85 F.3d 1232, 1238 (7th Cir. 1996).

However, admission of the statements pursuant to a *Santiago* proffer is conditional. *United States v. Haynie*, 179 F.3d 1048, 1050 (7th Cir. 1999). The *Santiago* procedure requires the government to "close the evidentiary loop at trial." *Davis*, 845 F.3d at 286. "If at the close of its case the prosecution has not met its

4

burden to show that the statements are admissible, the defendant[s] can move for a mistrial or have the statements stricken." *Haynie*, 179 F.3d at 1050.

## Background[3]

According to the Indictment, Jervis was the president of InvestUS, a purported real estate investment business offering to invest Victim Investors' funds in the U.S. real estate market for a profit. R. 1, Indictment ¶ 1. Ogoke, an Illinois-licensed attorney, was the president of Cardinal Legal Group, P.C. (Cardinal Legal), a law firm that offered services related to residential and commercial real estate transactions, including purported transactions associated with InvestUS and its Victim Investors. *Id*. As president of Cardinal Legal, Ogoke controlled the Interest on Lawyer Trust Account (IOLTA) bank account for the firm. *Id*. From approximately October 2015 to June 2017, Defendants allegedly fraudulently induced foreign nationals to invest approximately $1,355,930 into InvestUS by falsely and fraudulently representing to InvestUS investors (Victim Investors)—namely Victim A, Victim B, and Victim C—that their invested funds would make a profit on the purchase and sale of real estate in the United States. *Id*. ¶¶ 1–3.

As a part of the alleged scheme to defraud Victim Investors, Defendants would approach Victim Investors about a purported real estate investment program through

---

[3]The Court provides a brief background for context of the *Santiago* proffer. Many of the facts offered by either party in briefing the *Santiago* proffer are disputed by the other party. The Court provides this Background based, in large part, on the Indictment, and undisputed events from the docket. Further, the Government's evidence, as described, is what is expected at trial.

InvestUS. Indictment ¶ 5. Using the InvestUS website, emails, and other communications, Defendants then falsely represented to Victim Investors that InvestUS had: (1) identified undervalued real estate in the United States, namely Chicago; (2) purchased said real estate at a below-market price; (3) and sold said real estate within six months of the purchase for at least a 20 percent profit to the Victim Investor. *Id.* ¶¶ 4, 5. The Indictment alleges that at no time; however, did Defendants buy or sell real estate properties in the United States with funds invested by Victim Investors. *Id.* ¶ 5.

Defendants allegedly engaged in this elaborate scheme numerous times. The first component of the scheme consisted of Defendants sending Victim Investors real estate offerings in the Chicagoland area, which Defendants purported could be purchased at a purported "negotiated purchase price," and then "flipped" for a higher purported selling price within six months. Indictment ¶ 6. If Victim Investors allegedly agreed to purchase one of the offerings, Defendants at that point sent the Victim Investors purchase agreements for the purported below-market real estate property. *Id.* ¶ 7. Victim Investors subsequently wire transferred funds in payment of the purported purchase price (including any closing fees) to Defendants via Ogoke's IOLTA bank account. *Id.* ¶ 8. Once Victim Investors paid the purported purchase price, Defendants sent Victim Investors fake warranty deeds for the purported real estate property thus purportedly transferring legal title of the real estate property to

Victim Investors. *Id.* ¶ 9. The Indictment, however, alleges that Defendants never purchased said real estate for Victim Investors. *Id.*

The Indictment further alleges that, if Victim Investors purportedly purchased one property from InvestUS, Defendants allegedly attempted to convince Victim Investors to reinvest their profits from their initial purported real estate property investment into even more expensive real estate properties. Indictment ¶ 6. Defendants allegedly did so by falsely representing to Victim Investors that Defendants had resold the Victim Investors' purportedly acquired properties for a profit, which the Indictment alleges were Ponzi-scheme type payments to Victim Investors using funds from other Victim Investors or sources. *Id.* ¶¶ 10–11.

In an attempt to allegedly hide Defendants' illegal scheme from questioning Victim Investors, Defendants falsely represented to Victim Investors the following: Defendants were working to sell Victim Investors purported real estate property; Defendants would repay Victim Investors their last investment in full plus five percent if Defendants could not sell the Victim Investor's purported real estate property within six months; or that Defendants had wire transferred funds from the Victim Investors' purported real estate sale to Victim Investors, although Defendants had not done so. Indictment ¶ 12. In its final allegation, the Indictment alleges that Defendants misappropriated Victim Investor funds that had been transferred to Ogoke's IOLTA bank account, costing Victims A, B, and C losses of approximately $596,630. *Id.* ¶¶ 13, 15.

## Analysis

The Court first examines whether the Government has met its burden in showing the existence of and Ogoke's membership in the illegal scheme, before turning to whether the offered co-conspirator statements were made in furtherance of the scheme.

### I.    Evidence of the Charged Scheme and Ogoke's Participation in the Scheme

The Government argues that a scheme, involving Ogoke and his co-defendant Jervis, existed to falsely and fraudulently represent to Victim Investors that their real estate investments would be used to buy and sell real estate for a profit. Santiago Proffer at 12. To establish the first prong of the Government's *Santiago* Proffer, the Government submits the following five tranches of evidence (mostly witness testimony, email communications, public records, bank records, WhatsApp messages, contracts, and other communications) supporting the existence of a scheme: (1) recruitment of Victim Investors for the scheme; (2) purported purchase of real estate on behalf of Victim Investors; (3) the solicitation of funds for additional purported real estate investments; (4) additional concealment of the scheme from the Victim Investors; and (5) the misappropriation of the Victim Investors' funds. *Id*. Ogoke's opposition generally hinges on three points: the Government cannot prove its case solely on circumstantial evidence, R. 64, Resp. at 3; the evidence as presented fails to meet the preponderance of the evidence standard, *id*. at 4; and the evidence presented

is both "vague and non-specific," *id.* at 5. In the alternative, Ogoke requests that the Court set a hearing on the Proffer. *Id.*

As an initial matter, the Court must address the standards under which a *Santiago* Proffer is analyzed. While Ogoke attempts to dismiss the value of circumstantial evidence vis-à-vis direct evidence, the argument falls flat. "Circumstantial evidence is evidence that indirectly proves a fact. You are to consider both direct and circumstantial evidence. The law does not say one is better than the other." 2.03 Definition of "Direct" and "Circumstantial" Evidence, FED. CRIM. JURY INSTRUCTIONS 7TH CIR. (2023) at 17[4]; *see U.S. v. Johnson*, 592 F.3d 749, 754–55 (7th Cir. 2010) (government may prove a conspiracy on circumstantial evidence alone; *see also United States v. Pust*, 798 F.3d 597, 603 (7th Cir. 2015) (circumstantial evidence may be used to establish the existence of a conspiracy and a defendant's involvement in the conspiracy). "[T]he law make[s] no distinction between the weight to be given either [to] direct or circumstantial evidence." *Id.* For conspiracy, "the government need not establish that there existed a formal agreement to conspire; circumstantial evidence and reasonable inferences drawn therefrom concerning the relationship of the parties, their overt acts, and the totality of their conduct may serve as proof." *United States v. Redwine*, 715 F.2d 315, 320 (7th Cir.1983) (cleaned up). That is, the Court will evaluate circumstantial evidence no differently than direct evidence to

---

[4]THE FEDERAL CRIMINAL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT (Rev. 2023) can be found at https://www.ca7.uscourts.gov/pattern-jury-instructions/Criminal_Jury_Instructions.pdf.

determine whether the Government's proffered evidence could show an illegal scheme existed.

As for Ogoke's argument that the Government has failed to meet its burden, Ogoke, whether by accident or intention, conflates and misapplies case law supporting reasonable doubt, which is applied at the trial stage by the factfinder, and the preponderance of the evidence, a much lower burden applied by the Court rendering a *Santiago* decision (for instance, citing a paragraph in *United States v. Garcia*, 919 F.3d 489, 503 (7th Cir, 2019) that addresses the use of direct evidence under the reasonable doubt standard. *See* Resp. at 3). A *Santiago* proffer analysis rests on the preponderance of the evidence. *See United States v. Rodriguez*, 975 F.2d 404, 406 (7th Cir. 1992) (Finding that the government "must provide sufficient evidence to convince the district court, by a preponderance of the evidence (i.e. it is more likely than not).")." "The preponderance of the evidence standard requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence and to find the evidence to be sufficiently reliable and sufficiently probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty." *Siddiqui v. Holder*, 670 F.3d 736, 742 (7th Cir. 2012) (cleaned up). Simply put, does the evidence make the proposition more likely than not? *In re Meyers*, 616 F.3d 626, 631 (7th Cir. 2010) ("by a preponderance of the evidence[, which] means that the trier of fact must believe that it is more likely than not that the evidence establishes the proposition in question."). So, the Court only needs to

find that the evidence presented by the Government establishes a conspiracy by a preponderance of the evidence—nothing more.

With respect to Ogoke's specificity point, it is true that the Government neither specifically identifies nor itemizes all the evidence it intends to use to establish the existence of a conspiracy, or the statements made in furtherance of the illegal scheme, instead relying upon broad categories of statements, and summary of these statements, injecting specific examples at random. *See* Santiago Proffer at 12–21. But specifying each and every statement to be admitted under the exception at trial is not necessary. *See United States v. McClellan*, 165 F. 3d 535, 553 (7th Cir. 1999) (finding no error where trial judge allowed introduction of co-conspirator statements into evidence at trial where the statements were not specifically set forth in a *Santiago* proffer). Thus, description of statements by category is not, on its own, a basis for denial of the *Santiago* proffer.

Next the Court reviews the evidence of an illegal scheme that the Government intends to offer and Ogoke's involvement in that scheme. To satisfy these first two prongs, the evidence identified by the Government must support the scheme outlined by the Government and evidence tying Ogoke to the Government's theory of the illegal scheme. *See, e.g., United States v. Shah*, 2023 WL 22140, at *2 (N.D. Ill. Jan. 3, 2023) (finding requirement of *Santiago* proffer were met by the government where "many of the statements are admissions, they serve as the independent evidence, coupled with co-venturer statements themselves, to support conditional admission.").

11

But the question here is whether the Government has shown, by the preponderance of the evidence, that Ogoke participated in the scheme to falsely and fraudulently induce foreign nationals to invest in purported real estate properties through the alleged sham InvestUS program.

The Government clears this low bar. First, the Government has adduced evidence that supports its theory that Jervis and InvestUS employees Doreen Nasser and Andra Laamar, as part of the illegal scheme, recruited Victim Investors to participate in the InvestUS program. Santiago Proffer at 13. Ogoke's co-conspirators are thus implicated through the Government's admission of testimony from Victims A, B, and C as well as website screenshots and emails. *Id*. With such evidence, the Government intends to establish, and likely could establish, that the first component of the illegal scheme was the recruitment of Victim Investors by a preponderance.

Emails identifying real estate offerings to Victim Investors along with witness testimony support the second component of the illegal scheme as outlined by the Government—purported real estate purchases on behalf of the Victim Investors. The argument that Ogoke participated in the creation of fake legal documents at the heart of this case could be supported by the Government's proffered evidence. To support that Ogoke was involved in the scheme, the Government adduces enough evidence connecting Ogoke to the purported purchases of fake real estate in Chicago. R. 69, Reply at 2. The Government argues that it will show that the warranty deeds were fake through the use of official county property records and the testimony of actual

12

owners of the property. *Id*. Furthermore, the Government argues that it will show that Ogoke notarized these fake deeds that were purportedly signed by actual owners, including one such deed that was purportedly signed by a dead person. *Id*. Therefore, it is more likely than not that Ogoke, as a lawyer and notary, could have created and/or executed the fake warranty deeds and related documents as part of the illegal scheme.

Component number three, which is the solicitation of funds for additional purported real estate properties, is supported by witness testimony, emails, and other documents, according to the Government. First of all, the November 2015 email from Nasser to Victim A that included an invoice purporting a property had been purchased and flipped for a profit of $37,300 will show that Ogoke received funds from Victim Investors into his IOLTA bank account. Santiago Proffer at 6. The November 2015 email in and of itself is enough to connect Ogoke's IOLTA account to the solicitation of Victim Investors to reinvest their funds into the InvestUS program. Nasser too is connected to the illegal scheme through the very same November 2015 Email. When coupled with witness testimony, this could be enough evidence to support the Government's theory by a preponderance of the evidence.

The Government's evidence of witness testimony, emails, and other communications could establish the next component of the scheme—concealment of the illegal scheme. Specifically for the theory that Ogoke knowingly made false or fraudulent misrepresentations about InvestUS to Victim Investors, the Government's

evidence again passes muster. The Government will present evidence connecting Ogoke to InvestUS's false or fraudulent representations to Victim Investors. Emails from Ogoke to Victim Investors will show that Ogoke communicated with Victim Investors about the status of real estate transactions and funds, including a document that purportedly reflects an approximately $145,000 wire transfer to Victim Investor D's account. Reply at 3. The Government will present evidence, although not specified, that the document was fake and that Ogoke never requested the wire transfer to Victim D's account. *Id*. Additionally, the June 2017 email from Ogoke to Victim A assuring Victim A of a forthcoming remittance from the bank will show that Ogoke, under the Government's theory of the scheme, tried to buy time to complete the scheme. Santiago Proffer at 16. This evidence could support that it is more likely that Ogoke knowingly misrepresented to Victim Investors the status of fake real estate transactions in furtherance of the illegal scheme.

The last component of the illegal scheme is that Defendants used Ogoke's IOLTA account to misappropriate funds from Victim Investors; and this could be supported by the Government's intended evidence. The Government will use bank records that reflect Ogoke's IOLTA bank account was used to repay Victim Investors purported proceeds from fake real estate sales, to withdraw funds as cash, and to make large purchases seemingly unrelated to InvestUS's business to show Ogoke misappropriated funds. Reply at 3–4. The distribution and expenditure of funds from

14

the IOLTA bank account, under the preponderance standard, could likely be evidence of the misappropriation of Victim Investor funds by Defendants.

As recognized by the Seventh Circuit, *Santiago* proffers are by necessity "argumentative and summary." *Cox*, 923 F.2d at 527. "In proving a conspiracy, the government need not establish with whom the defendant conspired; it must simply prove that the defendant joined the agreement alleged, not the group." *United States v. Longstreet*, 567 F.3d 911, 919 (7th Cir. 2009). The only requirement is that "the evidence demonstrates that the co-conspirators embraced a common criminal objective, a single conspiracy exists, even if the parties do not know one or another and do not participate in every aspect of the scheme." *Id*. Essentially, the declarant need only be a co-conspirator. *United States v. Boliver*, 532 F.3d 599, 604-05 (7th Cir. 2008). This is the case here. At this stage, the Court finds the Government has included sufficient information in its *Santiago* proffer to establish the existence of an illegal scheme and Ogoke's along with Jervis, Nasser, and Laamar's membership in said illegal scheme.

## II.  Co-Conspirators' Statements

The Court next examines whether the statements were made in furtherance of the illegal scheme. The Court must, within context and with support beyond the statement, determine whether the statement furthered the conspiracy. *Cruz-Rea*, 626 F.3d at 937. "In order to satisfy the 'in furtherance' requirement, the coconspirator's statement need not have been exclusively, or even primarily, made to further the

conspiracy." *Id.* The Government attempts to admit statements found in emails, oral testimony, and WhatsApp messages between Jervis, Nasser, and Laamar[5] and Victims A, B, and C. Santiago Proffer at 17–21. The co-conspirator statements are divided into three categories of communications between Jervis, Nasser, and Laamar and Victim Investors including (a) recruitment for the real estate investment scheme; (b) purported investment in real estate; and (c) communications to conceal the scheme. *Id.* These statements, according to the Government, demonstrate the declarants' (Jervis, Nasser, and Laamar) role in the furtherance of the scheme. *Id.* at 17. Ogoke pushes back, pointing out in response that Ogoke is mentioned only once in co-conspirators' statements and again dismisses the reference as nothing more than a "legitimate role of a lawyer in a transaction." Resp. at 8. The Court now address each tranche of statements.

Statements by Jervis, Nasser, and Laamar to Victims A, B, and C are expected to be offered by the Government as evidence that the scheme was designed to recruit Victim Investors to the purported InvestUS program. Santiago Proffer at 17. As for communications about the real estate investment scheme, the evidence includes, but is not limited to, oral communications between Jervis and Victim Investors, namely a 2015 meeting between Jervis and Victim C; a January 2016 email and December 2015 WhatsApp message between Nasser and Victims B and A; and phone calls and

---

[5]Jervis was charged by the Government in connection with this scheme. Indictment. Nasser and Laamar are employees of InvestUS, who were not charged in relation to the alleged illegal scheme.

a November 2015 email between Laamar and Victim C explaining the InvestUS program. *Id*. 17–18.

Besides discussions about InvestUS's investment model, the Government intends to offer evidence of Jervis, Nasser, and Laamar purporting to have identified properties available for purchase for Victim Investors. Santiago Proffer at 19. The Government intends to offer email and WhatsApp evidence from Jervis to Victim A on January 20, 2016, to Victim B on March 3, 2016, and to Victim C on January 23, 2017, purporting to have either identified available properties or to be related to the execution of a contract or deed. *Id*. Similarly, the Government intends to offer emails, WhatsApp messages, and oral testimony from Nasser in October and December 2015 to Victim A about available purported property and Victim A's bank account information. *Id*. 19–20. For Laamar, the Government intends, as it has stated in its brief, to present evidence of Laamar communicating with Victim C about a purported purchase agreement for a purported investment property. *Id*. at 20.

Lastly, the Government intends to offer email and WhatsApp communications by Jervis to all three Victim Investors to conceal the scheme, such as an August 6, 2016 email regarding full payment to Victim A, and WhatsApp messages regarding payment to Victim A from June 2016 to February 2017. Santiago Proffer at 20–21.

The Court finds that the Government has shown, by a preponderance, that the foregoing summarized, and specific statements made by Jervis, Nasser, and Laamar were made in furtherance of the scheme. Specifically, the statements reflect the

17

declarants' efforts to conduct the business of the scheme by explaining the purpose of the scheme, making offerings, and executing contracts for the scheme, and covering up the scheme from suspecting Victim Investors. *See Cox*, 923 F.2d at 527 ("statements made to conduct and further the business of a drug conspiracy"); *see also United States v. Ashman*, 979 F. 2d 469, 489 (7th Cir. 1992) ("describing the purpose, method or criminality of the conspiracy"); *Alviar*, 573 F.3d at 545 (cleaned up) ("statements that are part of the information flow between conspirators intended to help each perform his role satisfy the 'in furtherance' requirement of Rule 801(d)(2)(e).").

Based on the foregoing information, the Court concludes there exists a reasonable basis to conclude the statements between Jervis, Nasser, Lamar, and Victims A, B, and C were made in furtherance of the scheme, and are conditionally admissible under Rule 801(d)(2)(E). *See Cruz-Rea*, 626 F. 3d at 937.

Lastly, the Court denies Ogoke's request for an evidentiary hearing. Resp. at 5. "The court can rule on each statement as it is elicited based on the evidence the Government has adduced to that point; the court can, even in the absence of a pretrial proffer, conditionally admit the body of coconspirator's statements subject to the Government's eventual proof of the foundational elements (the penalty for not so proving being a possible mistrial); or the court can hold a 'full blown' preliminary hearing to consider all evidence concerning the statements." *Cox*, 923 F.2d at 526 (cleaned up). The Court is satisfied with the briefing presented by both parties and

18

finds an evidentiary hearing unnecessary, and even counter to the interest of judicial economy. *See United States v. Doerr,* 886 F.2d 944, 967 (7th Cir. 1989) (finding an evidentiary hearing for the *Santiago* proffer an inefficient means of resolving the preliminary factual issues arising under the co-conspirator exception); *United States v. Andrus*, 775 F.2d 825, 837 (7th Cir. 1985) ("Witnesses will not have to be brought in twice. The court will not spend an excessive amount of time making a determination which is only preliminary.").

## Conclusion

For the foregoing reasons, the Court finds that the Government has met its burden for the conditional admissibility of the categories of statements identified in its *Santiago* proffer. As for statements not included in the categories of statements identified in the proffer, the Court will hear argument on an individual basis as the case develops, as necessary. However, if that process becomes untenable and/or unnecessarily prolongs trial, the Court may require that the Government preview statements, outside of the presence of the jury, in an organized manner with accompanying proffers.

Dated: May 1, 2024

United States District Judge
Franklin U. Valderrama